# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TERRENCE HUNTER, ET AL.,

  Plaintiffs,

   v.        Civil Action No.  04-0376 (JDB)

SPRINT CORPORATION, ET AL.,

  Defendants.

## MEMORANDUM OPINION

  Phillip Price II ("Price") is the sole remaining plaintiff in what had been a Fair Labor

Standards Act ("FLSA") collective action brought by more than two-dozen individuals for unpaid

overtime arising out of their employment with Sprint/United Management Company ("Sprint").

After reaching a settlement agreement with all plaintiffs other than Price, Sprint filed a motion for

summary judgment contending that the evidence cannot support a finding of liability against

Sprint and that, even if it could, Price cannot establish damages because Sprint has paid him more

than enough to compensate for any overtime he worked.  For the reasons that follow, the Court

will deny Sprint's motion.

## BACKGROUND[1]

  Price earned a Bachelor of Science degree in computer information systems from Florida

Agricultural & Mechanical University.  He began working for Sprint in January of 2000 as a

Network Technical Assistance Center ("NTAC") Engineer I.  He subsequently obtained a

---

[1] Unless otherwise noted, the facts in this section are undisputed and are derived from
statements made by the parties pursuant to Local Civil Rule 56.1.

promotion to the position of NTAC Engineer II, and later, following a reorganization, became a

Managed Network Operations ("MNO") Engineer II.  In those positions, Price functioned

primarily as a customer service representative, responding to telephone inquiries from clients who

were having technological difficulties with Sprint's Internet services.  His role was as a second-tier

responder -- that is, addressing questions or concerns that could not be handled by the person who

fielded the initial call.  In that role, he would attempt to diagnose the source of a particular client

problem and would assist the client in resolving it.  Often, he functioned as a liaison between the

customer and higher-level Sprint technicians or outside vendors, for example when the problem

appeared to require a modification of software code.  In addition to those duties, Price

occasionally updated the schedule for employees in his group, at his supervisor's request, and

provided on-the-job training to many newly hired employees.

When he began working at Sprint, Price's annualized salary was approximately $51,300.

Although he never specifically asked any of his supervisors about his eligibility for overtime pay,

he believed he was not entitled to it.  Price was, however, required to submit weekly time sheets

indicating hours worked, vacation or medical leave taken, and holidays observed.  He submitted

those time reports using Sprint's computer-based program for time- and leave-management, which

was known as the Distributed Time Entry ("DTE") system.  For employees who were paid on a

salary basis or who were deemed to be exempt from the FLSA's coverage, the DTE system

automatically would enter forty work hours every week, but each employee could modify the

default entries and was required to submit the resulting report.  Such employees, however, were

not expected to record overtime hours worked, even though the DTE system had a code for

"exempt overtime."  Except on three occasions in 2001 when Price recorded eight hours of

"exempt overtime" (twenty-four hours total), Price never reported working more than forty hours in a week.  His typical schedule was from 7:00 a.m. to 3:30 p.m., which included a half-hour break for lunch.  Price, however, contends that he actually worked an additional four to six hours each day -- usually working through his lunch and staying late.  Price testified that, although his supervisors never specifically instructed him to work through lunch or to work past 3:30 p.m., he was not permitted to leave work until he had resolved any customer problem that he had been working on, and he also testified that his supervisors were aware of his presence at work beyond his scheduled hours.

Periodically, Sprint conducted internal audits of FLSA compliance, which involved an analysis of employees' job descriptions to determine whether the employees should be designated as exempt from the FLSA's coverage.  In 1998, prior to Price's arrival, Sprint conducted an FLSA compliance review of NTAC positions and determined that the jobs qualified as exempt under the law.  This was consistent with the determination made during a previous review in 1995. Following the 1998 review, Sprint did not conduct another FLSA compliance audit of these positions until March 2003, at which time human resources personnel from Sprint interviewed a sampling of employees for purposes of assessing compensation levels and FLSA exemption status based on job functions.  That review led to a determination by Sprint that Price and others in similar positions may have been performing a mix of exempt and non-exempt duties.  In response, Sprint asked those employees, including Price, to complete a spreadsheet report that itemized the overtime hours they had worked from December 16, 2001, through March 1, 2003.  Price's report indicated that he had worked 1,000 hours of overtime during that period.  In his deposition, Price explained that he came up with that figure as a "best estimate" of the amount of time he had

worked in excess of forty hours each week, based on his recollection, but he acknowledged that he may have inadvertently put in for overtime on days when he had taken bereavement or medical leave and was not at work.

Upon review of Price's submission and those of other employees in similar positions, Sprint concluded that the maximum amount of overtime hours that any of the employees could have worked during that period was 600 hours, and the company decided to cap backpay for overtime at that level.  Sprint's evaluation of the overtime submissions included an examination of computer login records and security-pass time entry records, but no such information specific to Price has been presented as evidence in this litigation.  Having decided to limit employees to 600 hours of overtime, Sprint informed Price that he would receive his "rate of pay multiplied by .5 times for 600 hours, resulting in a total of $8,229.26 overtime compensation."  See Def.'s Ex. K. Price received that amount as a special disbursement in his August 13, 2004, paycheck.

In addition to the 1,000 hours of unpaid overtime that Price claims to have worked between December 16, 2001, and March 1, 2003, Price claims that he worked an additional 732 hours of unpaid overtime during the remaining nine months of 2003 and another 572 hours of unpaid overtime during the first eight months of 2004.  In all, Price asserts that he is due overtime compensation for 2,304 hours (minus the $8,229.26 that he already has received).

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

Where, as here, the Court would be the trier of fact on an issue if the case were to proceed to trial, the rules of summary judgment are altered.[2] "In such a case, the 'Court is not confined to deciding questions of law, but also may ... draw a derivative inference from undisputed subsidiary facts, even if those facts could support an inference to the contrary, so long as the inference does not depend upon an evaluation of witness credibility.'" OAO Alfa Bank v. Center for Public

---

[2] Neither party made a demand for a jury trial within the time prescribed by Rule 38 of the Federal Rules of Civil Procedure.

Integrity, 387 F. Supp. 2d 20, 39 (D.D.C. 2005) (quoting Cook v. Babbitt, 819 F. Supp. 1, 11 & n.11 (D.D.C. 1993)).

## ANALYSIS

The maximum-hours provision of the FLSA requires employers to pay any employee who is covered by the Act "not less than one and one-half times the *regular rate* at which he is employed" for all hours worked in excess of forty in a week.  29 U.S.C. § 207(a)(1) (emphasis supplied).  Employment is defined as work that is "suffered or permitted" by the employer, even if not requested.  See 29 C.F.R. § 785.11.  All hours of employment count for purposes of overtime calculation, so long as the "employer knows or has reason to believe that [the employee] is continuing to work."  Id.  An employer who violates the Act "shall be liable to the employee or employees affected in the amount of their ... unpaid overtime compensation, ... and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).

Sprint has asserted several defenses to Price's claim that it is liable to him for violations of the FLSA's overtime requirement, including (1) that Price was exempt from the FLSA's coverage during the relevant period, (2) that Price has failed to establish by reliable evidence either that he worked any overtime hours for which he was not compensated or that Sprint had reason to know that Price was working overtime, and (3) that, even if Price can establish liability, he is not entitled to anything more than the $8,229.26 he already has received from Sprint.  Hence, Sprint has moved for summary judgment.  As the following discussion explains, however, the Court finds that there are genuine issues of material fact (regarding the applicability of statutory exemptions and the number of overtime hours Price actually worked), which, at this stage of the litigation, precludes judgment as a matter of law against plaintiff.  The Court also concludes that,

even if Price had worked only the 600 hours of overtime for which Sprint purported to compensate him, summary judgment still would be inappropriate because Sprint miscalculated Price's "regular rate" of pay.

## I.      Exemptions to FLSA Coverage

The FLSA exempts from its coverage several categories of employees.  See 29 U.S.C. § 216.  These exemptions are treated as affirmative defenses to liability under the Act, which means that the defendant-employer has the burden of proving that the exemption applies to the plaintiff-employee.  See Danesh v. Rite Aid Corp., 39 F. Supp. 2d 7, 10 (D.D.C. 1999) (citing Corning Glass Work v. Brennan, 417 U.S. 188, 196-97 (1974)).  "[E]xemptions from the Act are narrowly construed against the employer in order to further Congress's goal of affording broad federal government protection."  Id. (internal quotation marks omitted); see also Mitchell v. Ky. Fin. Co., 359 U.S. 290, 295 (1959) ("It is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed.").  Sprint contends that the record evidence establishes that Price was exempt from the FLSA's coverage under either of two provisions of the Act:  the exemption for certain computer professionals, 29 U.S.C. § 213(a)(17), and the exemption for administrative employees, 29 U.S.C. § 213(a)(1).[3]  The Court, however, finds that Sprint has failed to carry its burden with respect to the claimed exemptions, particularly in light of the rule of narrow construction.

Since 1996, the FLSA has specifically exempted from its coverage:

---

[3] The Court rejects Price's contention that Sprint waived its right to assert the administrative exemption because it failed to plead it properly.  Sprint pleaded as its "Tenth Separate Defense" that "[p]laintiffs were exempt from the overtime provisions of the FLSA." Answer to Am. Compl. at 7.  Price has offered no support for a requirement that exemption defenses be pleaded with a greater degree of specificity.

any employee who is a computer systems analyst, computer programmer, software
engineer, or other similarly skilled worker, whose primary duty is --

    (A)    the application of systems analysis techniques and procedures, including
consulting with users, to determine hardware, software, or system
functional specifications;

    (B)    the design, development, documentation, analysis, creation, testing, or
modification of computer systems or programs, including prototypes, based
on and related to user or system design specifications;

    (C)    the design, documentation, testing, creation, or modification of computer
programs related to machine operating systems; or

    (D)    a combination of duties described in subparagraphs (A), (B), and (C) the
performance of which requires the same level of skills, and

who, in the case of an employee who is compensated on an hourly basis, is compensated at
a rate of not less than $27.63 an hour.

29 U.S.C. § 213(a)(17).  "Whether an employee is exempt is determined by the employee's actual

work activities, not by the employer's characterization of those activities through a job title or job

description."  Cooke v. General Dynamics Corp., 993 F. Supp. 56, 61 (D. Conn. 1997).

The only evidence in the record regarding Price's job functions comes from Price's own

deposition -- and it is scant at best.  Based on that testimony alone, there is no basis for applying

the computer-professional exemption to Price.  Sprint asserts that Price's primary job duties fell

within the scope of section 213(a)(17) because Price had to analyze problems that were "varied

and unique," he had to "interface with the customer or vendor" and conduct tests in trying to solve

problems, and he did not follow a manual or have a supervisor watching over his shoulder.  See

Def.'s Mem. in Supp. of Mot. for Summ. J. at 23-25.  The Court cannot agree.  The

responsibilities described in the computer-professional exemption require a substantially higher

degree of skill than what Price described in his deposition -- a conclusion that is readily supported

by a review of the reported cases that have applied section 213(a)(17).[4]  Price's job, based on the

---

    [4] See, e.g., Pellerin v. Xspedius Mgmt. Co. of Shreveport LLC, 432 F. Supp. 2d 657 (W.D.
La. 2006); Bagwell v. Fla. Broadband, LLC, 385 F. Supp. 2d 1316 (S.D. Fla. 2005); Bobadilla v.

evidence presently before the Court, did not involve "determin[ing] hardware, software, or system functional specifications" or the "design, development, documentation, analysis, creation, testing, or modification of computer systems or programs" based on such specifications.  Nor did the limited "modifications" he would make to computer software (i.e., uploading code provided by vendors) "relate[] to machine operating systems."  Rather, it appears that Price functioned as a technically proficient help-desk employee whose primary duty was customer service.  The mere fact that some of the tasks Price performed can be described as "consulting," "analysis," or "testing" relating to computers does not mean that Price falls within the ambit of a provision that is designed to exempt computer programmers, network designers, and software developers.

Sprint's claim that Price is exempt as an administrative employee is even weaker.  An "employee employed in a bona fide administrative capacity" within the meaning of 29 U.S.C. § 213(a)(1) is someone whose "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and ... [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  All that Sprint can point to in this regard is the testimony of Price that he sometimes modified the employee schedule at his manager's request and that he regularly trained new employees.  See Def.'s Mem. in Supp. of Mot. for Summ. J. at 25-27.  But the fact that Price was a leader among his co-workers does not transform him into a bona fide administrative employee.  Moreover, based on Price's own testimony, the work that he characterized as "doing [his supervisor's] job"

_____

MDRC, No. 03-cv-9217, 2005 WL 2044938 (S.D.N.Y. Aug. 24, 2005); Bergquist v. Fidelity Info. Servs., Inc., 399 F. Supp. 2d 1320 (M.D. Fla. 2005); see also Martin v. Ind. Mich. Power Co., 381 F.3d 574 (6th Cir. 2004).

amounted to, at most, thirty percent of his *overtime* hours; he provided no estimate of the work as a percentage of his *regular* hours.  See Def.'s Ex. A at 21-26.  Even if some of the tasks Price described could fit within the administrative exemption, the evidence suggests that they were far from his "primary duty."  Furthermore, the fact that his job involved the exercise of discretion and independent judgment *unrelated to management or general business operations* in no way renders him an exempt administrative employee, as Sprint seems to assert.  See Def.'s Mem. in Supp. of Mot. for Summ. J. at 26-27.

In short, there is a genuine issue of material fact as to whether one or both of these FLSA exemptions applied to Price.  Of course, the Court's conclusion that Sprint is not entitled to summary judgment based on these exemptions does not preclude Sprint from raising this defense at a future trial.  But on the present record, this affirmative defense cannot succeed.

## II.   *Prima Facie* Case for Unpaid Overtime

### A.   Proof of hours worked without compensation

In a situation such as this, where the employer's time records are inaccurate or incomplete, the plaintiff-employee can make out a *prima facie* case of an FLSA violation by alleging that he performed work for which he was not properly compensated and then "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).[5]  At that point, the burden shifts to the defendant-employer to "come forward with evidence of the precise amount of work

---

[5] The incompleteness of Sprint's time records is not reasonably disputed.  Indeed, a Sprint representative has acknowledged that employees classified as exempt did not have to report overtime hours.  Moreover, Sprint itself did not regard its DTE records as reliable when it first discovered the possible misclassification of Price and his co-workers, as it requested that employees provide self-assessments of overtime hours worked.

performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Id. at 687-88.  The fact that the employee's evidence is merely an approximation is not a bar to recovery.  Id. at 688; Reeves v. Int'l Tel. & Tel. Corp., 616 F.2d 1342, 1351 (5th Cir. 1980) ("Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, imprecise evidence on quantum can provide a 'sufficient basis' for damages.").

Rather than come forward with evidence tending to show the amount of work Price actually performed,[6] Sprint focuses on trying to negate "the reasonableness of the inference to be drawn from the employee's evidence."  Unfortunately for Sprint, such argumentation cannot carry the day on a motion for summary judgment.  Resolution of this dispute of material fact necessarily requires an assessment of credibility.  Certainly Sprint's evidence that Price claimed overtime for days that he was actually on leave and that he entered overtime into the DTE system on three occasions (totaling only twenty-four hours) might tend to undercut his credibility, as might other evidence that Sprint perhaps possesses.  But summary judgment is not the proper vehicle for such challenges.

### B.    Proof of employer knowledge

In addition to producing evidence sufficient to show the amount and extent of uncompensated overtime work (which Price has done), a plaintiff in an FLSA overtime action also must demonstrate that the work was "suffered or permitted" -- that is, that the employer had

---

[6] Sprint does produce general testimony about how it arrived at the conclusion that no one in Price's position could have worked more than 600 hours of overtime between December 16, 2001, and March 1, 2003, but it provides no specific evidence that would tend to provide a counter-approximation of the hours that *Price* actually worked, such as testimony from his co-workers or supervisors or records of Price's computer activity or security-pass usage.

knowledge, or should have had knowledge, of the overtime.  See 29 C.F.R. § 785.11.  Price

acknowledges that he did not report in the DTE system the precise hours he worked and for which

he now seeks compensation, but he testified at his deposition that his supervisors knew he was

regularly working through lunch and staying late -- often until "most of them were gone."  See

Def.'s Ex. A at 37-38.  Sprint, however, challenges the sufficiency of plaintiff's evidence in this

regard, noting the apparent inconsistency between Price's contention that supervisory personnel

had to have been aware of the hours he was working and his separate contention that his

immediate supervisor was often absent from the office, requiring him to do tasks that were her

responsibility.  See Def.'s Reply at 9.  Once again, however, that argument calls for a credibility

determination that the Court cannot make at this stage of the litigation.

       Sprint next argues that Price's claim must fail based on the fact that he submitted

inaccurate time reports, contrary to a company policy requiring employees to report their hours.

But, at the same time, Sprint's designated representative for purposes of this litigation testified that

salaried or exempt employees were not required to enter overtime hours in the DTE system.  See

Def.'s Ex. B at 33.[7]  Moreover, of the cases that Sprint relies on for the proposition that an FLSA

overtime claim is barred when the plaintiff-employee deliberately prevented the employer from

learning of the overtime (such as by submitting false time records), none involved an employee

who was told that he was *exempt* from the FLSA's coverage and therefore not entitled to overtime.

Thus, Sprint has failed to establish as a matter of law that Price's evidence of employer knowledge

is inadequate or otherwise negated by his own actions.

_____

       [7] Sprint contends in its reply brief that its representative was simply stating that exempt
employees were not expected to code their time as "overtime," even though they were required to
report all hours worked.  Def.'s Reply at 7.

### III.    Damages

Sprint argues that, even if Price is not exempt from the FLSA's coverage and even if he has established a *prima facie* case for unpaid overtime, Sprint still would be entitled to summary judgment because (1) the FLSA's two-year statute of limitations applies to Price's claim, (2) Price worked no more than 600 hours of overtime during those two years, (3) Sprint has fully compensated Price for 600 hours of overtime, and (4) Price cannot establish an entitlement to liquidated damages.  In short, Sprint contends that Price cannot proceed because the evidence demonstrates that he has no damages.

### A.    Determining the applicable statute of limitations

The parties agree that the limitations period for an individual's FLSA claim as part of a collective action is measured from the date of filing of the individual's notice of consent to sue, which for Price was August 25, 2004.  The usual limitations period is two years, but it is three years for any "cause of action arising out of a willful violation."  29 U.S.C. § 255(a).  Here, there is no contention that the statute of limitations bars Price's claims *entirely* -- only that it may impose a limitation on the extent of damages.  Depending on whether the violation was willful, Price's claim for unpaid overtime may be cut off as of August 25, 2002, or it may reach back as far as August 25, 2001.  In either case, though, Price has alleged unpaid overtime within the relevant time period and, in any event, in a situation such as this, a determination about the applicable statute of limitations cannot precede a determination that the employer is, in fact, liable.  Hence, the statute of limitations will not prevent Price from proceeding with his claims.

### B.    Calculating overtime pay due using the fluctuating workweek method

Even if the Court were able to conclude that Price had worked only 600 hours of overtime

(or fewer) during the applicable limitations period, Sprint still would not be entitled to summary judgment because Sprint has not demonstrated that it fully compensated Price for 600 overtime hours.  Based on undisputed facts, the Court concludes that Sprint improperly used the "fluctuating workweek" ("FWW") method to calculate Price's "regular rate" of pay and thereby to determine the amount of overtime compensation that he was due.  See 29 C.F.R. § 778.114.[8]

### 1.    Historical origins of the FWW calculation method

The origin of the FWW calculation method can be traced to two cases that were among the earliest Supreme Court cases to interpret the FLSA's overtime provisions.  In Overnight Motor Transp. Co. v. Missel, 316 U.S. 572 (1942), the Court considered "the application of the overtime section of the [FLSA] to an employee working irregular hours for a fixed weekly wage," id. at 573, and concluded that, even though the FLSA's overtime provisions do not address "any other method of paying wages except by hourly rate[,] ... we have no doubt that pay by the week, *to be reduced by some method of computation to hourly rates*, [is] also covered by the act," id. at 579 (emphasis supplied).  The FLSA, in other words, does not prevent employers from setting pay scales for covered workers in periodic terms other than per-hour, even though overtime calculations require the employer to ascertain *in hourly terms* the "regular rate at which [a worker] is employed," 29 U.S.C. § 207(a)(1).  Justice Reed, writing for the Court, further observed that

_____

[8] According to Department of Labor regulations and Supreme Court precedent, the "regular rate" of pay for FLSA purposes is an "actual fact" that "must be drawn from what happens under the employment contract," rather than from any agreement between the employer and employee.  29 C.F.R. § 778.108.  "Once the parties have decided upon the amount of wages and the mode of payment[,] the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary, 'regular rate' in [a] wage contract[]."  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424-25 (1945).

nothing in the FLSA requires that an employee's hourly "regular rate" remain constant from week to week.  To the contrary, the law permits covered employees to accept a "fixed weekly wage regardless of the length of the workweek," with the understanding that "the longer the hours[,] the less are the earnings per hour." Id. at 580.[9]  In such a case -- when an employee's base salary is a fixed weekly amount (or some other fixed periodic amount) and the number of hours worked varies each week -- the employee's hourly pay rate for FLSA purposes may fluctuate from week to week.  The Court held that such a fluctuating rate is nonetheless "regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week." Id.

But the Supreme Court also realized that permitting weekly fluctuation in an employee's "regular" hourly rate could result in manipulations that would in many cases render meaningless the statutory guarantee of time-and-a-half for overtime -- an entitlement that an FLSA-covered employee cannot bargain away.  A simple example illustrates the point.  Consider an employee who agrees to a $1,000 weekly salary for all hours worked.  If the employee works forty hours one week (i.e., no overtime) and the employer pays him $1,000, then his "regular rate" for that week obviously would be $25 per hour.  If the employee works ten hours of overtime the next week -- that is, fifty hours total -- and his paycheck for that week is still $1,000, can the employer honestly assert that he paid time-and-a-half for overtime hours, even though he paid the employee not a penny more than he had the prior week, on the theory that the worker's "regular rate" had fluctuated that week to $18.18 per hour?[10]  That was precisely the sort of factual situation

_____

[9] Of course, the resulting hourly pay rate must not fall below the FLSA-prescribed minimum wage.

[10] The first forty hours would be paid at the "regular rate" of $18.18 per hour (well above the minimum wage), for a total of $727.20, and the ten overtime hours would be paid at "one and

presented in Missel.  William Missel had been paid $25.50 per week by his employer, regardless of how many hours he worked (some weeks as many as eighty).  See 316 U.S. at 574.  "Nothing above the weekly wage was paid, because these maximum workweeks, computed at the statutory minimum rates with time and a half for overtime for the years in question, would not require an addition to the weekly wage."  Id.[11]  The Court found that Missel's employer had violated the FLSA by using this fluctuating pay-rate arrangement, notwithstanding that the employer had paid more than enough to exceed the statutory minimum wage for all the straight-time hours that Missel had worked as well as the minimum overtime wage (minimum wage and a half) for all the overtime hours he had worked.

By comparison, in a case decided the same day as Missel, the Court rejected an FLSA-based challenge to another flexible rate arrangement.  In Walling v. A.H. Belo Corp., 316 U.S. 624, 628 (1942), the employer and employee had mutually agreed to a basic rate of pay of $0.67 per hour, which meant that all hours worked in excess of forty-four (which in 1938 was the statutory straight-time maximum) had to be compensated at a rate of at least $1 per hour (i.e., time and a half) to comply with the FLSA.  The employer, however, also guaranteed a minimum weekly wage of $40 (regardless of the number of hours worked), and it permitted employees "to attend to personal affairs without deductions from pay," and, whenever employees "were required to work long hours in any week," gave them "compensating time off in succeeding weeks."  Id. at

---

one-half times the regular rate," 29 U.S.C. § 207(a)(1), or $27.27 per hour, for a total of $272.70. The straight-time pay and the overtime pay together would total $999.90.

[11] In 1938, overtime pay kicked in after forty-four hours and the minimum wage was $0.25 per hour.  When Missel worked eighty hours in a week and received $25.50, his straight-time hourly rate was $0.26 -- one cent an hour more than the minimum wage.

627-28. With that understanding, the employees received exactly $40 every week, except in those weeks when they worked more than *fifty-four and a half hours* and received a higher amount. Id. at 628. For work in excess of fifty-four and a half hours, the employees were compensated at the $1 per hour overtime rate. See id. at 629 ("When the employee worked enough hours at the contract rate to earn more than the guaranty, the surplus time was paid for at the rate of 150% of the hourly contract wage."). The Court found no FLSA violation:

> The contract says that the employee is to receive 67 cents an hour for the first 44 hours and "*Not less than* one and one-half time such basic rate" for each hour over 44. Consequently, if an employee works 50 hours in a given week, it might reasonably be said that his $40 wage consists of $29.48 for the first 44 hours (44 X $.67) plus $10.52 for the remaining six hours (6 X $1.753). To be sure, $1.753 is more than 150% of $.67. But the Act does not prohibit paying more; it requires only that the overtime rate be "not less than" 150% of the basic rate. It is also true that under this formula the overtime rate per hour may vary from week to week. But nothing in the act forbids such fluctuation.

Id. at 632. The Court thus interpreted the statute in a manner that would "afford the fullest possible scope to agreements" that are designed to address "the special problems confronting employer and employee in businesses where the work hours fluctuate from week to week and from day to day," including the problem of providing such an employee with "the security of a regular weekly income." Id. at 635.

As a purely mathematical matter, it must be admitted that efforts to reconcile these two cases are unsatisfactory. Given that Missel actually worked a maximum of eighty hours per week, see 316 U.S. at 574, his contract easily could have been characterized -- much like the contract in Belo -- as an agreement for straight-time pay of $0.26 per hour, with at least time and a half ($0.39 per hour) for all overtime hours worked and a guaranteed weekly wage of at least $25.50.[12]

---

[12] Conversely, the contract in Belo could have been characterized as an "agreement to pay a fixed wage, $40.00, for variable hours up to 54 ½" with an additional provision for hours

But what apparently troubled the Court about Missel's salary arrangement was that his contract included "no provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage." Missel, 316 U.S. at 581.  The understanding of the parties was that the salary of $25.50 per week was both a minimum *and a maximum*, regardless of the number of hours worked.  Missel was, for all intents and purposes, treated like an FLSA-exempt employee.  As a practical matter, then, the message from the Supreme Court in Missel and Belo was that the employment contracts of FLSA-covered workers must guarantee that the regular rate of compensation in any given week will not fall below the statutory minimum wage.

What the Missel and Belo decisions make clear is that the overtime compensation due to an employee will vary depending on whether the employment agreement is characterized as a fixed-wage contract or as an hourly rate contract.   Under the FLSA, overtime pay is calculated based on an employee's "regular rate" of pay.  See 29 U.S.C. § 207(a)(1).  As defined in Missel and Belo, the regular rate under a fixed-wage contract is the "wage divided by hours" worked in a given week.[13] Missel, 316 U.S. at 580 & n.16; see also Warren-Bradshaw Drilling Co. v. Hall, 124 F.2d 42, 44 (5th Cir. 1941) ("[I]f there is no agreement fixing the amount to be paid for regular and overtime work, the regular rate, as to it, may properly be determined by dividing the total pay each week by the total hours worked."), cited with approval in Missel, 316 U.S. at 580.  Alternatively, the regular rate for an hourly rate contract is the hourly rate specified by the

---

worked over the contract maximum.  Belo, 316 U.S. at 639 (Reed, J., dissenting).

[13] The Court in Belo provided the following example of a fixed-wage contract: "[A]n employer who engages a worker for a fixed weekly wage of $40 for irregular hours and works him 65 hours (in a year when the maximum workweek is 44 hours), owes the employee $46.38." Belo, 316 U.S. at 634.  In other words, the regular rate of pay for such a worker is about $0.61 per hour ($40/65 hours).

contract.  See Belo, 316 U.S. at 631.  When Missel's contract is deemed a valid *fixed-wage*

contract, with terms specifying a fixed wage of $25.50 for a workweek of up to eighty hours, his

employer would owe him an additional $5.86 for an eighty-hour week.[14]  But if Missel's contract

is treated as an *hourly wage* contract, his employer would owe him nothing more.[15]

The stark difference between the $5.86 that Missel would be owed for unpaid overtime in

an eighty-hour workweek under a fixed-wage contract and no additional compensation for the

same amount of overtime under an hourly wage contract demonstrates the importance of

characterizing the contract.  Moreover, as the different outcomes in Missel and Belo demonstrate,

the mutual understanding of the parties is key to making that determination.  Indeed, as noted

above, the pay arrangement rejected as unlawful in Missel might have been entirely permissible

but for the absence of evidence suggesting that Missel and his employer actually had

contemplated a fluctuating pay rate or the payment of time-and-a-half for overtime.  See Missel v.

Overnight Motor Transp. Co., 126 F.2d 98, 109 (4th Cir. 1942) ("[T]here [was] no evidence in the

record, nor any contention by the [employer], that the parties had agreed upon a rate of pay per

hour.").

2.     *Regulatory requirements for use of the FWW method*

With the companion decisions of Missel and Belo as a backdrop, the Department of Labor

promulgated regulations that provide "examples of the proper method of determining the regular

rate of pay in particular instances."  See 29 C.F.R. § 778.109.  Among the methods it approved

---

[14]Missel's regular rate is then $0.32 ($25.50/80 hours), and his overtime rate is $0.48, resulting in total compensation of $31.36 for the week.

[15]Missel's regular rate is then $0.26, and his overtime rate is $0.39, resulting in total compensation of $25.50 for the week, as per the $25.50 guaranty.

was the FWW approach, which applies to persons "employed on a salary basis [who] have hours of work which fluctuate from week to week." 29 C.F.R. § 778.114(a); see O'Brien v. Town of Agawam, 350 F.3d 279, 287 n.15 (1st Cir. 2003) ("[Section] 778.114 represents the Secretary of Labor's implementation of the Supreme Court's holding in [Missel].").  The FWW regulation provides:

> Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act *if* the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, *and if* he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a) (emphasis supplied).[16]  Although the FWW method occasionally is mischaracterized as an alternative to, or an exemption from, the FLSA's requirement of time-and-a-half for overtime, it is in actuality an interpretation of that requirement, as applied to a particular factual scenario.  An employee who is compensated pursuant to the FWW method in fact receives time-and-a-half, *not* merely half-time, for all overtime hours, but the straight-time component of the overtime compensation already is included in the fixed salary, which is why the regulation contemplates additional compensation of "not less than one-half [the] regular rate of pay."  See id. ("Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime

---

[16] Notably, none of the Department of Labor overtime regulations permit an employer and an FLSA-covered employee who works fluctuating hours to agree to a fixed salary as compensation for all hours worked, *including* all overtime hours.  Indeed, the FWW regulation states that, "where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula."  29 C.F.R. § 778.114(c).

pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.").

But, in order to prevent the use of fixed weekly salaries as a means of manipulating an employee's "regular rate" under the statute, the FWW regulation strictly limits the circumstances in which an employer is authorized to treat the employee's "regular rate" of pay as a variable and thus use the fluctuating overtime calculation method.[17]  Most significantly, the regulation requires that "the employee clearly understand[] that the salary covers whatever hours the job may demand in a particular workweek *and* [that] the employer pay[] the salary even though the workweek is one in which a full schedule or hours is not worked."  29 C.F.R. § 778.114(c).  Furthermore, the FWW method contemplates that the employee's hours actually fluctuate from week to week.  See id. ("Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours ....").  And, by its plain terms, the method applies only when (1) the parties clearly agree that the fixed salary constitutes adequate straight-time payment (i.e., compensation "apart from overtime premiums") for all hours worked and (2) the employee *receives extra compensation* of at least half his regular rate of pay, *in addition to the fixed salary*, for overtime hours during the weeks when he works overtime.

> 3.    *Application of the FWW method to Price's job*

Price and Sprint devote large sections of their respective briefs on this summary judgment motion to addressing whether "contemporaneous payment of overtime compensation is a necessary prerequisite for application of the fluctuating workweek method," Rainey v. Am. Forest

---

[17] The overtime regulations essentially adopt a rebuttable presumption that an employee's "regular rate" will be constant rather than fluctuating.

& Paper Ass'n, 26 F. Supp. 2d 82, 100 (D.D.C. 1998), or whether instead it is enough that

overtime compensation (i.e., the "extra compensation, in addition to the [fixed] salary," 29 C.F.R.

§ 778.114(a)) is made retroactively, as happened here.  There is a split of authority on this issue.

Compare Rainey 26 F. Supp. 2d at 100 (holding that the FWW requires contemporaneous

overtime payment); Cowan v. Treetop Enter., Inc., 163 F. Supp. 2d 930, 941 (M.D. Tenn. 2001)

(same); Scott v. OTS, Inc., No. 02-cv-1950, 2006 WL 870369, at *13 (N.D. Ga. Mar. 31, 2006)

(same), with Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 39-40 (1st Cir. 1999) (holding that the

FWW method could be used to retroactively calculate unpaid overtime compensation for an

employee who had been mistakenly classified as exempt); Tumulty v. FedEx Ground Package

Sys., Inc., No. 04-cv-1425, 2005 WL 1979104, at *5 (W.D. Wash. Aug. 16, 2005) (expressly

rejecting the reasoning of Rainey and holding that the FWW method does not require

contemporaneous payment of overtime); Perez v. RadioShack Corp., No. 02-cv-7884, 2005 WL

3750320, at * 8 (N.D. Ill. Dec. 14, 2005) (same).[18]  Ultimately, however, the Court need not take a

stand on that particular question here because the evidence demonstrates that the FWW method is

otherwise inapplicable to Price's job.

    Among the reasons that the FWW method cannot be used to determine Price's regular rate

of pay is that there was no "clear mutual understanding" between Sprint and Price that Sprint

---

[18] Sprint asserts that an opinion letter by the Department of Labor definitively resolves this question.  In that letter, the Department stated, in response to an employer's question, that, "[w]here the facts show that a straight salary was paid without regard to hours worked and FLSA overtime compensation was not paid, the [FWW] coefficient table may be used to compute back pay."  Op. Letter of the Wage & Hour Div., 1996 WL 1005216 (July 15, 1996).  The usefulness of this letter, however, is limited by the vagaries of the question presented.  The inquiry that prompted the letter, for example, did not identify why the employer had not paid overtime compensation to "nonexempt employees," nor did it address the employees' understanding of their entitlement to overtime or the employer's understanding of its right to dock workers' pay.

would pay Price the fixed salary if he worked *less* than a full-time schedule in a particular week. See 29 C.F.R. § 778.114(c) (requiring, as a precondition for use of the FWW method, that the employer pay the employee's full weekly salary "even though the workweek is one in which a full schedule of hours is not worked").  Sprint maintained a policy that, unless an employee utilized earned leave (e.g., vacation or "floating holiday" time), it would deduct a full or partial day's pay in the event that either (1) the employee was required to attend a court proceeding as a defendant or witness, or (2) the employee was unable to report to work due to inclement weather.  See Pl.'s Ex. H. at HUSP 2942 & HUSP 2947.  The unavoidable implication of this policy is that an employee who had exhausted his leave bank (or not accrued sufficient leave time) would have been docked by Sprint for such missed time.

That is precisely the sort of arrangement that the Department of Labor has found to be inconsistent with use of the FWW method.  In a 1999 opinion letter, the Department reviewed the following employer policy:  "If the employee is absent from work for a full day to take care of personal business, the employer will charge one day's vacation against the employee's accrued vacation, [but if] the employee has not accumulated any vacation days, the employer may dock their salary 1/7th of their weekly salary amount."  Op. Letter of the Wage & Hour Div., 1999 WL 1002415 (May 28, 1999).  Upon review of that policy, the Department "d[id] not agree that [the employer] may meet [its] overtime pay obligations by use of the fluctuating workweek" under those circumstances.  Id.  It further explained that -- with limited exceptions for disciplinary deductions (the example given being an employee sent home from work because of drunkenness) -- "[d]eductions for absences for personal business or routine sickness generally *may not* be made from the salary of an employee paid on a fluctuating workweek basis."  Id. (emphasis supplied).

Likewise, the Department advised an employer in another opinion letter that, when it pays overtime using the FWW method, "*deductions may be made from vacation or sick leave banks* because of absences for personal reasons or illness, as long as *no deductions are made from an employee's salary*," and further advised that wage deductions remain impermissible under the FWW regulation when "there is no paid leave to substitute for employee absences."  Op. Letter of the Wage & Hour Div., 1999 WL 1002399 (May 10, 1999) (emphasis supplied).  Sprint's contention that these opinion letters "do not address the specific situation ... where an employee is able to use vacation/holiday time to cover for the absences," Def.'s Reply at 3-4, is flatly contradicted by the text of the letters.  The Department's opinion, which the Court finds persuasive, is unambiguous on this point:  employers who use the FWW method of compensation must compensate their employees in full, notwithstanding absences for personal reasons, even if the employee has not accrued sufficient leave time to cover the absence.  See also Op. Letter of the Wage & Hour Div., 2006 WL 1488849 (May 12, 2006) ("[An employer] may not make full day deductions from the salary of its fluctuating workweek employees when the employee has exhausted his or her sick leave bank or has not yet earned enough leave to cover the absence.").  The only recognized exception is for disciplinary actions where the employee's misconduct resulted in missed work.  Sprint's policy, however, reflected a different understanding -- and, to the extent that Price was familiar with the policy, it likely reflected his understanding, as well.

An additional reason for rejecting Sprint's use of the FWW method to calculate Price's overtime is the absence of evidence that Price ordinarily worked an irregular schedule of hours, as contemplated by the FWW regulation.  See 29 C.F.R. § 778.114(c) ("Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours ....").  Quite the

contrary, the undisputed evidence indicates that Price was expected to work a minimum of forty hours every week, unless he utilized earned leave, and that he typically was assigned to a shift of 7:00 a.m. to 3:30 p.m, which included a half-hour lunch break, five days a week.  See Pl.'s Ex. I at 17.  The regularity of such shift work is hardly consistent with the situations that the FWW convention was designed to address.

Furthermore, where the understanding of an employer and an employee about overtime compensation is based upon a false premise that the employee is *exempt* from FLSA coverage, it does not automatically follow, as Sprint argues, that the parties mutually understood that the fixed weekly salary constituted "straight time pay for whatever hours [the employee] is called upon to work in a workweek, *whether few or many*[,] ... rather than for working 40 hours or some other fixed weekly work period."  See 29 C.F.R. § 778.114(a).  It is true, of course, that an employee who is told he is exempt from FLSA coverage (i.e., that he is not legally entitled to collect overtime) will understand that he will not receive any additional compensation beyond the agreed-upon salary if he works *more* than forty hours in a particular week, but that does not necessarily translate into the kind of understanding contemplated by the FWW regulation -- namely that working *fewer* than forty hours in a week also would result in full compensation.

The FWW method was developed to permit FLSA-covered employees who work irregular hours to negotiate a consistent *minimum* salary with their employers.  But it does not permit FLSA-covered employees with regular schedules to accept a fluctuating "regular rate" that produces a *constant* salary for all hours worked, as FLSA-exempt employees are free to do and as Price and Sprint did in this case.  Nor does anything in the history or the language of the FWW regulation indicate that the calculation method should be used as a fallback whenever employers

mistakenly classify employees as FLSA-exempt.[19]

Price took his job believing that he was not entitled to any overtime premiums, but if that belief was mistaken, he may not surrender the protections of the FLSA.  Should it turn out that Price was not exempt from the FLSA, his unpaid overtime must be calculated based on a "regular rate" of pay that is consistent with the law and the relevant facts -- and here the record reflects that Price's job involved neither the sort of mutual understanding nor the sort of fluctuating schedule that would permit his regular rate of pay to vary from week to week and still comply with the FLSA.  Instead, all the evidence indicates that his salary was premised on the expectation of a regular forty-hour workweek.  See Def.'s Ex. A at 38 (Price testifying that supervisors told him he was "only getting paid 40 hours a week").  Hence, Sprint may not calculate Price's regular rate of pay based on all the hours that he actually worked, but rather must do so on the basis of "the number of hours which the salary is intended to compensate" -- that is, forty hours per week.  See 29 C.F.R. § 778.113(a).[20]

_____

[19] Indeed, if the FWW regulation were interpreted in the manner that Sprint urges, employers would have a substantial incentive to err on the side of classifying employees as FLSA-exempt whenever the functions performed are at the margins of an exemption -- rather than to specifically negotiate an overtime compensation arrangement with the employee at the outset -- because the financial risk associated with misclassification would be relatively small if retroactive calculation were routinely available.

[20] Sprint's contention that the calculation of overtime due would be the same whether it used the FWW method or the usual method of computing overtime for salaried employees, see 29 C.F.R. § 778.113, reflects a fundamental misunderstanding of the regulations.  See Def.'s Mem. in Supp. of Mot. for Summ. J. at 16-19; Def.'s Reply at 12.  Section 778.113 describes the method of calculation to be used when the weekly salary is intended to serve as compensation for a *fixed* number of hours.  Since the Court has determined that Price's job did not qualify for a fluctuating "regular rate," the regular rate must be determined by dividing the fixed weekly salary by the *fixed* number of hours for which that salary is intended to provide straight-time compensation.  Applying that formula to the facts of this case, Price's regular rate of pay would be about $24.66 per hour (that is, Price's approximate annual salary of $51,300 divided by fifty-two weeks -- i.e., a

To recapitulate, the Court concludes that, under the circumstances presented by this case, it would be inappropriate retroactively to apply the FWW method to determine Price's "regular rate'" of pay under the FLSA.  Nothing in this opinion, however, should be construed as finding that Price and Sprint could not have developed a work arrangement consistent with the FWW method.  The Court simply holds that they did not do so here.

### C.    Price's entitlement to liquidated damages

As a final matter, the Court will address Sprint's contention that Price is not entitled to liquidated damages in this case.  "[T]his Court has adopted a strong presumption in favor of awarding liquidated damages, also known as 'double damages'" in FLSA cases.  Falicia v. Advance Tenant Servs., Inc., No. 02-cv-2463, 2005 WL 1522064, at *1 (D.D.C. June 27, 2005). If, however, "the employer shows to the satisfaction of the court that the act or omission giving rise [to the violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of [the FLSA], the court may, in its sound discretion, award no liquidated damages ...."  29 U.S.C. § 260; see also Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 465 (D.C. Cir. 1976) ("[I]t [is not] enough that it appear that the employer probably did not act in bad faith; he must affirmatively establish that he acted both in good faith and on reasonable grounds.") (emphasis supplied).  Needless to say, given the present posture of this case and the Court's resolution of other issues, the question of Price's entitlement to liquidated damages can hardly be resolved at this time, when there has yet to be a determination of liability (or even a

---

weekly gross salary of about $986.54 -- and then again by forty hours).  That translates to an overtime rate of about $37 per hour for all hours worked in excess of forty per week.  At that rate, if Price can prove that he worked 600 hours of overtime, he would be entitled to over $22,000 in overtime, which is substantially greater than the $8,229.26 that Sprint has paid Price as backpay for overtime.

definitive determination that Price is non-exempt).  And, in any event, Sprint has provided only

minimal evidence about its employee-classification process, and certainly not enough evidence to

support a determination by the Court that Sprint's decision was made reasonably and in good faith

even before the Court has determined whether that decision complied with the law.


## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record, the Court will deny

Sprint's motion for summary judgment.  A separate order has been issued herewith.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge


Dated:   __September 22, 2006___